**ALLIANCE OF AMERICAN INSURERS,**
National Association of Independent
Insurers, New York State Insurance
Association, Allstate Insurance Compa-
ny, Government Employees Insurance
Co., Liberty Mutual Insurance Co.,
Lumbermans Mutual Casualty Co.,
Metropolitan Property & Liability In-
surance Co., Utica Mutual Insurance
Company, Richard C. Van Essendelft,
and Gerald J. Pierce, Plaintiffs–Appel-
lants,

v.

Mario M. CUOMO, in his capacity as Gov-
ernor of the State of New York, James
P. Corcoran, in his capacity as Superin-
tendent of the Department of Insurance
of the State of New York, Defendants–
Appellees.

No. 727, Docket 87–7888.

United States Court of Appeals,
Second Circuit.

Argued March 31, 1988.

Decided Aug. 9, 1988.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Kenneth R. Feinberg, David O. Bickart, William F. Tyndall, of counsel), for plaintiffs-appellants.

Robert Abrams, New York State Atty. Gen. (Jane Breslin Jacobs, New York City, of counsel), for defendants-appellees.

Before TIMBERS and KEARSE, Circuit Judges and WEXLER, District Judge *.

WEXLER, District Judge.

### Introduction

This action involves a challenge to the constitutionality of §§ 8 and 40 of Chapter 266 of the New York Medical and Dental Malpractice and Professional Conduct Act of 1986 (the "1986 Act"). Plaintiffs are three insurance trade associations, six insurance companies, and two insurance policy holders. The insurance companies and at least 132 association members write property and casualty insurance in the State of New York. The association members account for approximately 40% of the total property and casualty insurance premiums collected in the State of New York in 1985. The individual policy holders are residents of New York.

Plaintiffs brought suit in the United States District Court for the Southern District of New York against Mario Cuomo, the Governor of New York, and James Corcoran, the New York Superintendent of Insurance, in their capacities as state officials. In their suit, plaintiffs sought a declaration that §§ 8 and 40 of the 1986 Act deprive them of property without due process of law and constitute a taking of their property without just compensation, thereby violating their rights under the United States Constitution.

Defendants moved for dismissal on the grounds that no case or controversy exists and that abstention is appropriate. The district court granted defendants' motion for dismissal, finding both that the lawsuit failed to present a case or controversy and that the Court should abstain under the *Burford* doctrine. This appeal followed.

### Background

Under the regulatory system governing the insurance industry in New York, both prior to and after the 1986 Act, insurance companies, including plaintiff insurers, serve as guarantors of all medical malpractice insurers in the state, even though they do not write medical malpractice insurance themselves. Most of the medical malpractice insurance in New York is offered by two providers, the Medical Liability Mutual Insurance Company ("MLMIC") and the New York Medical Malpractice Insurance Association ("MMIA"). MLMIC is owned and operated by physicians and is affiliated with the Medical Society of the State of New York. MMIA was established in 1975 by the New York State Legislature in response to the withdrawal of many private insurance companies from the medical malpractice market in New York. MMIA is a non-profit, joint underwriting association created by law to provide medical malpractice insurance to those physicians and surgeons who are unable to obtain it otherwise. N.Y.Ins.Law § 5502 (McKinney 1985 & Supp.1988). All insurers, including plaintiff insurance companies and association members, are statutorily required to be members of MMIA as a condition of writing property or casualty insurance in New York. N.Y.Ins.Law § 5502(a). As members, plaintiffs must contribute funds to MMIA to cover its operating deficits. N.Y.Ins.Law §§ 5507, 5509 (McKinney 1985 & Supp.1988).

Liability insurers in New York, including plaintiff insurance companies and many association members, are also required to contribute to the New York Property/Casualty Insurance Security Fund (the "Fund"). The Fund secures all claims by insured New York residents against insolvent insurance companies. N.Y.Ins.Law § 7603(a)(1) (McKinney 1985 & Supp.1988). The Superintendent of Insurance ("Superintendent") is responsible for establishing the level of contribution and may compel contribution when the Fund falls below $150 million. N.Y.Ins.Law § 7603(c)(1) (McKin-

---

* Honorable Leonard D. Wexler, Judge of the United States District Court for the Eastern District of New York, sitting by designation.

ney 1985). MMIA and MLMIC are covered by the Fund and are also subject to contribution to it. N.Y.Ins.Law §§ 5502(b), 7603.

When the regulatory system governing the insurance industry was originally enacted, the system provided safeguards to ensure adequate claim reserves and rates as well as to maintain sound financial operations of insurers. Medical malpractice insurers were required to submit annual rate requests to the Superintendent for approval, including actuarial evidence that the requested rates were reasonable and self-supporting. The Superintendent was responsible for assuring that insurance companies set neither excessive nor insufficient rates. N.Y.Ins.Law §§ 2303, 5503 (McKinney 1985). In addition, he was authorized to rehabilitate or liquidate insolvent insurers. N.Y.Ins.Law §§ 7402, 7404 (McKinney 1985). When, pursuant to regular examination of a carrier's financial records, the Superintendent found that the company's liabilities exceeded its admitted assets, including required reserves, he was required to find the company insolvent. N.Y. Ins.Law §§ 307, 309, 315, 1309 (McKinney 1985 & Supp.1988). This system was designed to ensure that insurance companies had sufficient assets to cover any claims, while still offering reasonable rates.

In response to the ever-worsening medical malpractice crisis, New York State enacted the 1986 Act in an attempt to reduce the cost of medical malpractice insurance and the number and amount of malpractice claims. Section 8 of the 1986 Act, N.Y. Ins.Law § 2343(c) (McKinney Supp.1988), imposes a moratorium on medical malpractice insolvencies by suspending the Superintendent's authority to order the liquidation or rehabilitation of any medical malpractice insurer until January 15, 1990. Section 40 of the 1986 Act, Ch. 266, 1986 N.Y.Laws 503, 570, authorizes the Superintendent to stabilize rates for medical malpractice coverage from July 1, 1985 to June 30, 1988 without conducting hearings in which insurance companies may participate. It also authorizes an 8% cap on the imposition of surcharges for medical malpractice premiums used to satisfy any defi-

ciency resulting from the stabilization of rates during this three year period. *Id.*

Plaintiffs contend that §§ 8 and 40 of the 1986 Act unconstitutionally deprive them of property without due process of law by significantly increasing demands on plaintiffs to cover the severe deficit of MMIA. Plaintiffs also allege that the effect of §§ 8 and 40 amounts to an unconstitutional taking of their property by forcing them to contribute to the Fund to pay for claims left by the current insolvency of MMIA and MLMIC, which insolvency has purportedly been caused by the 1986 Act.

Plaintiffs assert that MMIA and MLMIC are currently operating at severe deficits. At the time of the 1986 Act, MLMIC was operating with a deficit of approximately $1.2 billion, MMIA with a deficit of about $85 million. The combined total, approximately $1.3 billion, dwarfs the reserves in the Fund of $150 million. Both of these providers currently meet the statutory definition of insurer insolvency under N.Y. Ins.Law § 1309(a) (McKinney 1985). Section 8 of the 1986 Act, however, overrides § 1309 and withdraws until 1990 the Superintendent's powers to act to rehabilitate the MMIA or MLMIC despite their insolvency. Therefore, plaintiffs contend, MMIA and MLMIC can continue to operate in a manner that is economically detrimental to the Fund. In addition, § 40 supersedes the original requirement that insurers set adequate and self-supporting rates. The implementation of § 40 authorizes the Superintendent to hold down medical malpractice insurance premium costs by stabilizing rates at artificially low levels without considering input from insurers. In plaintiffs' view, the rates are "stabilized" at the expense of increasing the current deficits of MMIA and MLMIC and ensuring their insolvency.

Plaintiffs project that, by 1990, the combined deficits of MMIA and MLMIC will reach more than $4 billion, and that the 8% surcharge to be imposed by the Superintendent after June 1988 can neutralize only a small portion of the 1985–88 deficit and none of the prior deficit. Plaintiffs allege that the introduction of §§ 8 and 40 to this

depressed financial picture can lead to only one result. They contend that, given the size of this $4 billion deficit, MMIA can forestall insolvency, if at all, only by requiring contribution from its members, including plaintiffs. Regardless of such contribution, because MLMIC's assets are grossly inadequate as well, in 1990 or thereabout, the Superintendent will be forced to seize MLMIC for insolvency. If at the time MMIA is also unable to return to solvency through involuntary contributions, it too will be seized. At that point, outstanding claims from MLMIC, and possibly MMIA, must be satisfied from the Fund. The amount of those claims, accounting for the deficit of $4 billion, will obliterate the Fund and any prior contributions. As a result, insurers, including plaintiffs, will be called upon involuntarily to provide massive contributions in order to replenish the Fund and satisfy the claims.

Plaintiffs contend that these massive, potentially bankrupting, involuntary contributions to MMIA and the Fund will be the direct result of the suspension, under § 8, of the Superintendent's power to seize insolvent companies and that the magnitude of such contributions will be exacerbated by the Superintendent's setting of confiscatory rates under § 40 without affording insurers an opportunity to be heard on the reasonableness of those rates. Plaintiffs argue that, because of the resulting leaps in the size of the deficits, these sections of the 1986 Act establish the certainty that plaintiffs will be called upon to recoup the deficits by contributions to MMIA, the Fund, or both.

As noted above, defendants moved to dismiss the complaint on alternate grounds. First, they argued that the facts alleged failed to establish a justiciable case or controversy under Article III of the United States Constitution because the future injury alleged was too speculative. Second, defendants contended that even if jurisdiction exists, the court should abstain from decision because the case involves a complex ongoing regulatory scheme of great import to the state. In addition, they claimed that abstention was warranted since the interpretation of the 1986 Act is

unsettled and depends upon resolution of state law issues. Finally, defendants argued that there are related state court proceedings which should be deferred to because they present similar challenges.

The district court granted defendants' motion and dismissed plaintiffs' complaint on both justiciability and abstention grounds. The court stated, "The evidence available at this time will simply not permit this court to resolve the disputed issues with any degree of certainty." *Alliance of American Insurers v. Cuomo*, No. 87 Civ. 169, slip op. at 6 (S.D.N.Y. Sept. 9, 1987) [available on WESTLAW, 1987 WL 17431]. Thus, the district court found plaintiffs' claims, too speculative to constitute a case or controversy. In addition, the court held that, even overlooking the speculative nature of the plaintiffs' alleged injury, abstention was warranted. *Id.* at 7. The court abstained under the *Burford* doctrine, saying, "This court's interference would only disrupt state efforts to create a cohesive policy to deal with it's [sic] medical malpractice crisis." *Id.* at 12. Plaintiffs appealed the District Court's decision.

One additional fact that should be noted is that on April 25, 1988, after the District Court handed down its decision, the Superintendent informed property and casualty insurers, including plaintiff insurers, that the Fund had been valued at less that $150 million as of December 31, 1987. As a result, resumption of mandatory contribution has already been ordered, effective May 15, 1988.

### Justiciable Case or Controversy

In order for a federal court to assert jurisdiction over an action, the court must find that a justiciable "case or controversy" exists. U.S. CONST. art. III § 2. To satisfy the requirements of Article III, a plaintiff "must allege some threatened or actual injury ..." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Such injury must be "sufficiently real and immediate", *Blum v. Yaretsky*, 457 U.S. 991, 1000, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496, 94

S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)), as opposed to merely " 'conjectural' or 'hypothetical' ", *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675 (citations omitted). The difference between a threatened injury and a conjectural one is a matter of degree, and since no precise test exists, each case must be considered on an individual basis. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir.1968). The requirement that the harm alleged be of sufficient immediacy does not, however, require plaintiffs "to await the consummation of threatened injury [before] obtain[ing] preventive relief." *Blum*, 457 U.S. at 1000, 102 S.Ct. at 2784 (citations omitted).

The District Court neatly summarized the injury that plaintiffs allege: "[I]mplementation of Sections 8 and 40 will cause increased malpractice insurer insolvency and deplete the Fund, which will trigger [plaintiffs'] obligations to pay." *Alliance*, slip op. at 6. The question, then, is whether, given the structure of the statutory scheme and the present financial factors, there is a sufficiently "realistic" likelihood that plaintiffs will be required to make involuntary contributions to the Fund in the "immediate" future.

Defendants argue that plaintiffs have failed to allege an "actual" or "threatened" injury sufficient to constitute a case or controversy. Defendants contend that because plaintiffs have not claimed that they were called upon to contribute to the Fund in the past thirteen years or that individual policy holders have lost benefits as a result of the 1986 Act, plaintiffs have not suffered an "actual" injury. Defendants next argue that plaintiffs' claim of "threatened" injury is too tenuous to create a case or controversy. They maintain that four countervailing factors make the claim of future injury speculative. First, defendants contend that other provisions in the 1986 Act modify tort law so as to lower the amounts of medical malpractice awards. Second, the 1986 Act provides for additional monies in dividends and interest to be added to the Fund over time. Third, the

Fund does not cover deficits of insurers, but only claims against insolvent ones. Finally, the Fund has paid all such claims without mandatory contribution since 1973. Defendants contend that, given these factors, and the ameliorative intent and potentially stabilizing effect of the 1986 Act, there can be no certainty that plaintiffs will suffer any future injury.

The District Court concurred with defendants' position that the injury alleged by plaintiff was "far too speculative", stating, "Plaintiffs have not alleged that they have yet suffered any harm. Nor can they show that they will suffer harm in the future." *Id.* at 6–7. The court dismissed the complaint, finding it lacked a case or controversy sufficient to sustain federal jurisdiction.

Although this Court believes that this case presents a close question on the issue of justiciability, we find that the requirements of Article III are satisfied and that the District Court erred in its decision to relinquish jurisdiction. It appears from the opinion below that the District Court did not base its holding on whether there is sufficient immediacy and reality to plaintiffs' claims of harm. The Court simply summarized plaintiffs' allegations and stated that they were "disputed by defendants." The District Court then concluded that, "The evidence available at this time will simply not permit this court to resolve disputed issues with any degree of certainty." *Id.* at 6. For its holding, the District Court relied only upon a comment in the legislative history of the 1986 Act and a decision by the New York Court of Appeals, *American Insurance Ass'n v. Chu*, 64 N.Y.2d 379, 487 N.Y.S.2d 311, 476 N.E. 2d 637, *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).

The New York State Legislature noted at the time the 1986 Act was enacted that the complete effect of some of the reforms contained in the 1986 Act could not be determined for some time. However, this general pronouncement by the legislature should not have precluded the District Court from examining the financial data presently available and determining wheth-

er plaintiffs have alleged a realistic claim that they are likely to be injured by the operation of §§ 8 and 40 of the Act.

This Court is equally unpersuaded by the New York case law upon which the District Court relied. In *Chu* the New York State Court of Appeals dismissed a constitutional challenge by the insurance industry to a state statute authorizing a diversion of $204 million from three state insurance funds to the state's general revenue fund. The insurers contended that such transfers would ultimately require increased contributions by threatening the solvency of the funds. The New York court held, "The action is premature and as a matter of law may not be maintained if the issue presented for adjudication involves a future event beyond control of the parties which may never occur." *Id.* at 385, 487 N.Y.S.2d 311, 476 N.E.2d 637 (citations omitted).

Although *Chu* did involve the Fund and some of the same plaintiffs as the present case, those shared factual elements do not render *Chu* controlling. First, the standard used by the New York court, namely, "a future event beyond control of the parties which may never occur," is different from the "immediate" and "realistic" harm standard set forth by the Supreme Court. Of course, the rule adopted by New York State has no binding effect on the federal court.

Moreover, the *Chu* Court expressly found that all of the funds at issue would still have sufficient assets to cover future claims, even after the transfers occurred. The Court reasoned that because the transfers were actually "loans" for which the state legislature appropriated monies in the event of a short-fall, the transfers presented "no risk" that claimants would be left unpaid or unprotected from insolvent insurers. *Id.* at 386, 487 N.Y.S.2d 311, 476 N.E.2d 637. Therefore, the *Chu* court evaluated the financial data and the history of the Fund and determined that the plaintiffs would not, in fact, suffer the injury from which they sought relief. The court rejected plaintiffs' argument that the legislature might decide not to fund future appropriations, might repeal prior appropria-

tions, and might repeal the statutory requirement of annual appropriations to the funds, finding the possibility of the combination of those events occurring to be remote and not within the control of the parties then before the court. The court held that plaintiffs' contention that they would be required to contribute to the Fund to be "nothing more than speculation." *Id.*

The case before this Court presents a much different scenario than that which existed in *Chu*. Unlike the court in *Chu*, the District Court below did not analyze the factual underpinnings of plaintiffs' claims of imminent harm. Moreover, in contrast to *Chu*, the District Court never concluded that it is unlikely that plaintiffs will suffer the harm of which they complain. Instead, the court merely reviewed each side's position and held that not enough evidence exists to resolve the dispute to a certainty.

Under these circumstances, the District Court should have afforded plaintiffs an opportunity to take limited discovery and justify their claim of justiciability at a hearing. Before dismissing a case for want of jurisdiction, a court should permit the party seeking the court's intervention to engage in discovery of facts supporting jurisdiction. *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986); *Williams v. Casey*, 657 F.Supp. 921, 925 (S.D.N.Y. 1987). Failure to allow such discovery has been held to be an abuse of discretion. *Majd–Pour v. Georgiana Community Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir.1984). Particularly where the facts supporting jurisdiction are complicated, discovery and the taking of oral testimony is advisable before a motion to dismiss for lack of jurisdiction is granted. *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir.) *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). *See United States v. SCRAP*, 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973) (where plaintiffs allege a "specific and perceptible harm" which defendants dispute, the proper course is for defendants to move for summary judgment on the issue of justicia-

bility and demonstrate to the court that no genuine issue of fact exists.)

Furthermore, although *Chu* and the instant case each involve questions concerning the financial health of the Fund, and the *Chu* court was of the opinion that the Fund was not in jeopardy at that time, the *Chu* court's factual assessment of the Fund's stability is at best minimally relevant to the case at bar. In the three years since *Chu* was handed down, the financial picture surrounding the Fund has apparently changed dramatically. The Fund's assets now appear to be valued at significantly less than the combined deficits of MLMIC and MMIA.

■ As the Court has noted, in order for plaintiff to invoke federal court jurisdiction, plaintiffs' allegations of threatened injury must be sufficiently realistic and immediate. The court finds that plaintiffs have satisfied this requirement.

As to the necessity that the claim of injury be realistic, plaintiffs allege that MLMIC and MMIA, if not insolvent prior to the 1986 Act, will certainly become insolvent due to the rate stabilization under § 40. In combination with the ban on liquidation and rehabilitation of insolvent insurers under § 8, the 1986 Act inevitably increases the deficits which plaintiffs must support, either through direct contributions to MMIA or indirect contributions to the Fund. Plaintiffs contend that such contributions are inevitable because the Fund is currently valued at significantly less than the already existing deficits of MLMIC and MMIA. In fact, plaintiffs allege that the Fund is valued at less than the MMIA deficit alone. They claim that such contributions will be required and will, in the end, be passed on to policy holders in the form of higher rates. Thus, they assert that plaintiff insurers and policy holders will be injured by being compelled to bear the expenses of the contributions caused by §§ 8 and 40 of the 1986 Act without the opportunity for hearing or judicial review.

■ In light of the severe deficits MLMIC and MMIA face, the implementation of §§ 8 and 40, which stabilize rates and prohibit liquidation of insolvent medi-

cal malpractice insurers, presents a realistic threat of injury to plaintiffs by inexorably forcing insurance company contribution in the future and the passing on of such costs to individual policy holders. Although the District Court prematurely dismissed the complaint because of a perceived lack of "certainty" to plaintiffs' claims of injury, certainty as to the ultimate resolution of this case on the merits is not required at this juncture. Although experts may disagree among themselves, and the court may be unable to determine the precise extent of plaintiffs' injury, it is sufficient for the purposes of jurisdiction that plaintiffs face a realistic and immediate danger of being unconstitutionally deprived of their property. This Court finds that as §§ 8 and 40 are already in effect and the deficits are severe and ever-increasing, plaintiffs' grim projections on the future financial stability of the Fund and sheer contention that they will be responsible for satisfying claims against it are grounded in fact and are not merely an exercise in speculation or conjecture.

In addition, in determining whether §§ 8 and 40 operate unconstitutionally to deprive plaintiffs of their property without due process or just compensation, the District Court will have the benefit of testimony and actuarial evidence not yet fully explored by the Court. This Court does not now opine as to whether plaintiffs will eventually succeed in their lawsuit but decides only that the injury alleged is sufficiently realistic to support jurisdiction.

■ Turning to the issue of immediacy of the threatened injury, the Court finds that the harm plaintiffs allege they will suffer is sufficiently immediate so as to convey jurisdiction. In the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Supreme Court set forth a number of factors to be considered in determining whether an alleged injury is ripe for adjudication. The Rail Cases involved a constitutional challenge under the takings clause to the Rail Act of 1974, which reorganized a number of existing railroads under one private corporation and provided for the con-

veyance of railroad properties to the corporation in exchange for securities of the corporation and guaranteed obligations. The Court held pertinent to its inquiry whether decisions to be made presently or in the future would be affected by resolving the issue now, whether the statutory scheme denied options otherwise available, and, "particularly significant," whether "there is no better time to decide the constitutionality of the [a]ct[ ] ... to minimize or prevent irreparable injury." *Id.* at 144, 95 S.Ct. at 359. The Court, concluding that "we will be in no better position later than we are now....", held that even though no transfers of property had yet taken place, the threat of future mandatory conveyances without prior determinations of the constitutionality of the statute's general compensation plan did state a case or controversy that a federal court would and should resolve. *Id.* at 145, 95 S.Ct. at 359.

Here, too, the Court finds that, for the purpose of preventing irreparable injury, the Court will be in no better position later to adjudicate plaintiffs' claims than it is now. The 1986 Act is already in effect and the deficits continue to grow. In fact, as already noted, after the District Court issued its ruling, pursuant to the Superintendent's order, insurer contribution to the Fund commenced May 15, 1988. This is a central part of the very injury claimed by plaintiffs as the basis for their complaint. This ordering of contributions to the Fund not only demonstrates the immediacy of the injury plaintiffs allege, but also evinces the realistic nature of the anticipated harm which leads plaintiffs to seek judicial redress.

We therefore hold that plaintiffs' complaint states a justiciable case or controversy under Article III of the United States Constitution.

### Abstention

The Supreme Court has established three basic abstention doctrines which are relevant to the case at bar. First, under the doctrine set forth in *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), abstention is appropriate in federal cases in which a constitutional issue may be avoided or altered by a state court's construction of pertinent state law. Second, under the *Burford* rule, abstention may be appropriate where a federal case raises "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed.2d 1424 (1943). Third, "wise judicial administration" may counsel federal abstention when there is concurrent state litigation which creates "exceptional circumstances." *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1246. However, when federal jurisdiction is proper, abstention is the exception, not the rule. *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244.

The district court found that abstention was warranted in this case under the *Burford* rule. Defendants urge us to uphold that decision, and, in addition, argue that both the *Pullman* and *Colorado River* exceptions to the exercise of federal jurisdiction are applicable. Plaintiffs argue that there are no bases for abstention under any of the three doctrines. We are persuaded by plaintiffs' arguments.

### *Burford* Abstention

The *Burford* rule applies in situations where it is prudent for a federal court to refrain from interfering in cases presenting state law issues relating to complex state regulations where the federal court decision may disrupt important state policies. *Burford*, 319 U.S. at 331–32, 63 S.Ct. at 1106. Such abstention is appropriate when a federal case presents a difficult issue of state law, the resolution of which will have a significant impact on important state policies and for which the state has provided a comprehensive regulatory system with channels for review by state courts or agencies. *Id.* at 333–34, 63 S.Ct. at 1107–08. In short, federal courts should "abstain from interfering with specialized, ongoing state regulatory schemes." *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir.1980).

Defendants argue that the insurance industry is subject to just such a specialized, comprehensive state regulatory system under the New York Insurance Law. The regulation of medical malpractice insurance is a significant state interest and is part of New York's comprehensive and complex insurance scheme. Under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15 (1982), Congress has entrusted the regulation of insurance to the states. Furthermore, the system provides for state court judicial review. See N.Y.Civ.Prac.L. & R. 7801–06 (McKinney 1981 & Supp.1988).

This Court has accepted that characterization of New York's insurance regulations in prior cases. In *Law Enforcement Ins. Co., Ltd. v. Corcoran*, 807 F.2d 38, 43 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987), for instance, we noted that "New York has set up a comprehensive plan of regulation of insurance companies ..., legislat[ing] on a matter of special state concern [as declared by Congress]". In addition, this Court recognized that the state courts "have long been active partners" in insurance regulation, particularly in the areas of liquidation and rehabilitation. *Id.* In fact, in *Levy,* 635 F.2d 960, and *Law Enforcement Ins. Co.,* 807 F.2d 38, this Court upheld abstentions by federal courts based on *Burford,* stating, "New York provides a unified method for the formation of policy and determination of cases by the [Superintendent] and by the state courts' ...[,] a method which would only be impaired by federal court intervention." *Law Enforcement Ins. Co.,* 807 F.2d at 44 (quoting *Burford,* 319 U.S. at 333–34, 63 S.Ct. at 1107–08).

The District Court relied upon *Levy* and *Law Enforcement Ins. Co.,* as well as the decisions in *Tolfree v. New York Title & Mortgage Co.,* 72 F.2d 702 (2d Cir.), *cert. denied,* 293 U.S. 619, 55 S.Ct. 216, 79 L.Ed. 707 (1934) (pre-*Burford* case in which the court abstained for comity reasons in action seeking injunction against an ongoing state court liquidation) and *Ambiance, Inc. v. Commodore General Ins. Co.,* 553 F.Supp. 285 (S.D.N.Y. 1982) (court did not expressly rely on *Burford,* but abstained on principles of comity and avoidance of conflict in case involving an attempt to enjoin a state court receivership proceeding) for its conclusion that the *Burford* doctrine required that it abstain from hearing plaintiffs' suit. These cases, while arguably supporting the district court's position that federal courts should not interfere with state court liquidation or rehabilitation proceedings, do not, however, support the use of abstention on *Burford* considerations in this specific case.

■ The cases the lower court relied upon all involved ongoing state judicial proceedings regarding the Superintendent's power to declare these insurers insolvent and subject them to centralized state receivership. In contrast, this action is not a liquidation case. There is no challenge to a state administrative or judicial order made pursuant to state law. This case does not involve the federal courts in disrupting any ongoing state judicial or administrative proceedings. No unclear state laws, issues, or rulings are implicated. Finally, plaintiffs do not challenge the Superintendent's authority to liquidate or rehabilitate insolvent insurers. Rather than challenging the Superintendent's exercise of that power, plaintiffs are attacking the constitutionality of the state statute which has removed that power from him. Prior cases recognizing the need for federal courts to abstain from interfering with the Superintendent's exercise of authority over insolvent insurance companies are simply not controlling.

There is, however, a more similar case recently decided by the First Circuit. In *Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer,* 832 F.2d 240 (1st Cir. 1987), plaintiff, an involuntary joint underwriting association created by statute to write medical malpractice insurance in Rhode Island, challenged the constitutionality of a freeze on medical malpractice premiums which allegedly would have increased the association's deficit by $13.5 million. The rate freeze, a one-year interim measure, effectively prevented any hearings on the establishment or review of rates and operated to strip the Commissioner of his authority to set non-confiscatory rates.

The First Circuit held that *Burford* abstention was not proper. The court noted that plaintiff complained about the unconstitutionality of a state statute under the United States Constitution, not the acts of the Commissioner under state law, *i.e.*, the complaint challenged the lack of a hearing on rates, not the rate-setting itself. The court also reasoned that there would be no interruption of a complex state regulatory process should a federal court hear the case because the Rhode Island Legislature had already short-circuited that process by enacting this interim measure. Finally, the *Pfeiffer* plaintiff did not challenge any factual determinations by state agencies or state courts. Since neither review nor modification of state agency or court determinations were involved, a state court could do no more than a federal court.

■ This Court finds the reasoning of the First Circuit to be convincing and readily applicable to the instant case. Here, plaintiffs challenge the constitutionality of a state statute which precludes the Superintendent from liquidating insolvent insurers but which authorizes him to establish artificially low rates without a hearing. Plaintiffs contend that §§ 8 and 40 of the 1986 Act, an interim measure, operate to strip the Superintendent of his power to set non-confiscatory rates, resulting in imminent harm to them by depriving them of property without due process of law or just compensation. As in *Pfeiffer*, there is no danger of interrupting the course of the state's comprehensive insurance scheme because the 1986 Act is an interim measure. Moreover, the complaint here involves the unconstitutionality of a state statute on due process and taking grounds under the United States Constitution, rather than the acts of the Superintendent under state law. There are no factual determinations of state agencies or courts at issue in this case. This case is a direct challenge to the constitutionality of a state statute, a controversy federal courts are particularly suited to adjudicate.

The considerations warranting invocation of *Burford* abstention are absent in the case now before the Court. There is no

ambiguous state law issue. Specific channels of judicial review under state law are irrelevant to consideration of this federal question. There is no attempt to avoid any prior state court or agency determination. This case does not involve federal courts in supervising, interrupting, or meddling in state policies by interfering in state regulatory matters. While the resolution of this case could have a broad impact on important state policy, "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail*, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978). *See also Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968) (complaint charging numerous "deficiencies in the admissions policies and practices" of the New York City Housing Authority did not warrant federal court abstention under *Burford* as it sought federal intervention in a state regulatory scheme only to the extent necessary to protect federal constitutional rights). The fact that §§ 8 and 40 of the 1986 Act may be part of a coherent state regulatory system does not diminish the gravity or the complexion of the federal constitutional challenge plaintiffs make. "The state has no right to an unconstitutional policy, coherent or otherwise." *Allstate Ins. Co. v. Sabbagh*, 603 F.2d 228, 232 (1st Cir.1979). The Court finds that abstention based on the *Burford* doctrine is neither necessary nor proper.

*Pullman* Abstention

■ The *Pullman* abstention doctrine holds that "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). The application is limited to those cases in which construction of a state statute by a state court could avoid or modify the federal question. *Zwickler v. Koota*, 389 U.S. 241, 248–49, 88 S.Ct. 391, 395–96, 19 L.Ed.2d 444 (1967). However, when a state statute "is not fairly subject to an

interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question...." *Id.* at 251, 88 S.Ct. at 397 (quoting *United States v. Livingston,* 179 F.Supp. 9, 13 (E.D.S.C. 1959), *aff'd,* 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960)). Thus, "abstention is not to be ordered unless the state statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Zwickler,* 389 U.S. at 251 n. 14, 88 S.Ct. at 397 n. 14. *See also McRedmond v. Wilson,* 533 F.2d 757, 761 (2d Cir.1976).

Defendants argue that the 1986 Act is unsettled because it has not yet been construed in conjunction with the comprehensive New York State Insurance Law or under the New York Constitution. Defendants also argue that the fundamental issue at stake in this case is whether the rates set by the Superintendent under § 40 of the 1986 Act were adequate and reasonable. This issue of adequacy of rates has been raised in a pending state case (*MMIA v. Superintendent,* No. 17505/86, N.Y. 27 App.Div. 1st Dep't) and will be resolved by state court interpretation. If the state court finds the rates inadequate, defendants argue, the state will be required to re-determine the rates and make up for deficits, thereby avoiding or modifying plaintiff's constitutional claims of taking and due process deprivation.

There are three reasons why *Pullman* abstention is not appropriate in this case. First, there are two statutes at issue, § 8 as well as § 40 of the 1986 Act. Even assuming that a state court's construction of § 40 might modify the federal constitutional challenge to § 40, as the plaintiffs challenged §§ 8 and 40 both alone and taken together, § 8 would remain to be adjudicated. Second, plaintiff's federal question in this case does not depend on the state law issue of adequacy of rates. The fundamental issue concerns a deprivation under a state law of federally guaranteed due process and the right not to have property taken without just compensation, not the appropriateness of a state official's action under that law. *See Pullman,* 312 U.S. at 501, 61 S.Ct. at 645. Finally, the challenged sections are not ambiguous or uncertain. As the Court wrote in *McRedmond,* 533 F.2d at 762, "[W]here a state statute is unambiguous the court must perform its adjudicative duty and has no right to abstain merely because a state court decision might render a federal adjudication unnecessary."

For these reasons, we agree with the district court that the *Pullman* doctrine is not applicable to the case plaintiffs have brought.

*Colorado River* Abstention

■ Defendants next claim that abstention is appropriate under *Colorado River* due to the pendency of two actions in state court (*MMIA v. Superintendent,* No. 17505/86, N.Y.App.Div. 1st Dep't and *MMIA v. Cuomo,* No. 17380/86, N.Y.App. Div. 1st Dep't), which involve some of the parties and subject matter which are present in this case.

The *Colorado River* doctrine is a prudential one. The mere fact of concurrent state and federal proceedings "does not, without more, warrant staying exercise of federal jurisdiction." *Colorado River,* 424 U.S. at 816, 96 S.Ct. at 1245. In fact, "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction...." *Id.* at 817, 96 S.Ct. at 1246 (emphasis added) (quoting *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910)). Rather, "[o]nly the clearest of justifications will warrant dismissal." *Id.* at 819, 96 S.Ct. at 1247.

The Supreme Court has identified six factors that should be considered in determining whether "exceptional circumstances" justifying abstention under the *Colorado River* doctrine are present in a given case. *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246. These are: (1) the convenience or inconvenience of the forum; (2) whether piecemeal litigation can be avoided; (3) the order in which jurisdiction was obtained; (4) the source of law for decision; (5) whether the state court can adequately protect the rights of the party seeking federal jurisdiction, and (6) the court first as-

serting jurisdiction over property in an *in rem* action. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19–27, 103 S.Ct. 927, 938–43, 74 L.Ed.2d 765 (1983); *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1247. In *Cone*, the court also noted that "the presence of federal-law issues must always be a major consideration weighing against surrender [of federal jurisdiction]." 460 U.S. at 26, 103 S.Ct. at 942. Under the *Colorado River* doctrine, the nature of the inquiry is not whether there are reasons to exercise federal jurisdiction, but rather whether exceptional circumstances exist which justify dismissal in deference to a pending state court proceeding. *Id.* at 25–26, 103 S.Ct. at 941–42.

Defendants claim that exceptional circumstances do exist in this case. Defendants concede that the factors of jurisdiction over property in an *in rem* action and convenience of the forum are not relevant here. They argue, however, that the relative progress of this and the state court cases weighs in favor of dismissal because the state proceedings were filed first and are already on appeal on the merits, while the federal action has not yet proceeded to discovery. Defendants also contend that the "source of law" factor favors abstention since the state law claims cannot be adjudicated in federal court, but are currently being adjudicated in state court. In addition, they suggest that the challenge to § 8, implicit in the state's cases, should await explicit assessment until resolution of the state issues by the state court, since, according to defendants, any other approach would create piecemeal litigation. Finally, they claim that for these reasons, the state court can give more complete relief to the parties.

Defendants' reasoning is not persuasive. Most importantly, it is not at all clear that this case and the state court actions are "concurrent." Similarity of parties is not the same as identity of parties. The plaintiff in the state cases is MMIA, an association which includes the plaintiffs here, but which is distinct from its members. The plaintiffs here are not participants in the state cases, and conversely, MMIA is not a plaintiff in this case. Also, the issues engendered in the state actions are dissimilar to those presented here. The federal case raises federal constitutional questions concerning past deficits and the ban on rehabilitation. As defendants acknowledge, the question of the unconstitutionality of § 8 has not been raised in the state actions. In the state cases, the issues are the adequacy of rates and the status of the monies in the Fund. While there may be some overlap of subject matter, it is not sufficient to make these actions concurrent. Such differences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal. *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir.1986).

Assuming, *arguendo*, that the federal and state actions are concurrent, dismissal is still unwarranted. There is no threat of piecemeal litigation. The resolution of the federal constitutional questions will settle the federal law issues, regardless of the outcome of the state litigation. Further, the source of law in this proceeding is the federal constitution, not state laws. Thus, the federal courts are more appropriate arbiters for this action and the presence of federal issues weighs heavily against dismissal. Finally, since there is no danger of piecemeal litigation, no assumption of jurisdiction over property, and no state law decisions involved in this case, the order of filing and the progress of the state litigation cannot outweigh the factors in favor of retaining federal jurisdiction.

Defendants' argument thus accounts to one of inconvenience. Certainly, it would be more convenient for defendants to litigate two suits rather than three. It clearly would also be more convenient to avoid another lengthy discovery process. But inconvenience of litigation, rather than forum, is insufficient to establish exceptional circumstances justifying dismissal. "Where, as here, a federal court properly

has subject matter jurisdiction, it has a 'virtually unflagging obligation' to exercise that jurisdiction, even if an action concerning the same matter is pending in state court." *Id.* at 327 (quoting *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246).

In addition, defendants successfully challenged an attempt by certain of the plaintiffs in the instant case to intervene in one of the state cases. Having argued for plaintiffs' exclusion in the state court case, defendants' position that the state litigation protects plaintiffs' rights and interests is somewhat disingenuous. It is clear to this Court that the exercise of federal jurisdiction is necessary to provide plaintiffs with a forum in which to seek complete relief. Dismissal under the *Colorado River* doctrine of "exceptional circumstances" is unwarranted.

Therefore, we find that the District Court should not have abstained from exercising jurisdiction over this case.

### State Law Claims

One final point bears mentioning. Plaintiffs have brought, pendent to their cause of action under the federal constitution, a claim that the operation of §§ 8 and 40 violates New York State's Constitution. Although this point was not raised by the parties, either in the court below or before this Court, and the District Court never addressed the issue *sua sponte,* the present Court recognizes the District Court's lack of authority to adjudicate plaintiffs' state law claims. The Eleventh Amendment to the United States Constitution states, "[T]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court has expanded the literal language of the Eleventh Amendment to preclude not only suits brought against a state by citizens of other states, but also suits brought by a state's own citizens. *E.g.,*

*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The Supreme Court has also carved out an exception to this bar, holding that a suit for prospective injunctive relief on a constitutional claim against a state official is not a suit against the state. *Ex parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). The Court reasoned that a state official acting in an unconstitutional manner does so outside the scope of her authority and thus loses the Eleventh Amendment immunity that otherwise attaches to her official actions. *Young,* 209 U.S. at 159–60, 28 S.Ct. at 453–54; *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). A key element to this Eleventh Amendment exception is that immunity is only forfeited as to conduct that is violative of the United States Constitution. Federal court adjudication of a claim challenging a state official's conduct under state law is therefore not permissible as it would fly squarely in the face of the Eleventh Amendment and the limited nature of the exception for constitutional claims. In *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984), the Supreme Court stated, "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Therefore, the Eleventh Amendment precludes the District Court from adjudicating plaintiffs' claim that §§ 8 and 40 violate New York State's Constitution.

The Eleventh Amendment bar against plaintiffs' state law claim is unaffected by the fact that plaintiffs seek prospective rather than retroactive relief, *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911, or by the posturing of plaintiffs' state law cause of action as pendent to plaintiffs' federal con-

stitutional claim, *id.* at 119–20, 104 S.Ct. at 918–19; *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

Accordingly, the District Court is instructed to dismiss for lack of subject matter jurisdiction plaintiffs' claim that §§ 8 and 40 violate the New York State Constitution. *See* Fed.R.Civ.P. 12(h)(3). The fact that neither party contested the District Court's authority to hear this aspect of the case does not act to confer jurisdiction on the Court since a challenge to subject matter jurisdiction cannot be waived and may be raised *sua sponte* by the district court, *Bernstein v. Universal Pictures, Inc.,* 517 F.2d 976, 979 (2d Cir. 1975), or by a federal appellate court, *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986).

### *Conclusion*

For the reasons set forth throughout this opinion, we hold that this case presents a justiciable case or controversy and is appropriate for federal court adjudication. In addition, we hold that the Eleventh Amendment precludes the District Court from asserting subject matter jurisdiction over plaintiffs' state law claim. We therefore reverse the District Court's decision to dismiss plaintiff's complaint, direct that the District Court dismiss plaintiffs' claims under New York State's Constitution, and remand this case to the District Court for proceedings consistent with this opinion.