**MEDICAL MALPRACTICE JOINT UNDERWRITING ASSOCIATION OF RHODE ISLAND**

v.

**Maurice C. PARADIS [1], in his capacity as Director of the Department of Business Regulation and as Insurance Commissioner of the State of Rhode Island.**

**Civ. A. No. 86–0394–T.**

United States District Court, D. Rhode Island.

Feb. 8, 1991.

---

1. Maurice C. Paradis is the current Director of Business Regulation and the Insurance Commissioner. Mark A. Pfeiffer held these offices at the time this suit was instituted.

670

David P. Whitman, Providence, R.I., for plaintiff.

Richard Wooley, Office of the Attorney General, Providence, R.I., for defendant.

## DECISION AND ORDER

TORRES, District Judge.

This is an action to declare void a Rhode Island statute "freezing" medical malpractice insurance rates and to require the Rhode Island Director of Business Regula-

tion (who also serves as Insurance Commissioner) to conduct hearings for the purpose of determining whether the rates proposed by the plaintiff for the year 1986–1987 are fair and reasonable. The action is brought pursuant to 28 U.S.C. § 2201 (The Declaratory Judgment Act) and 42 U.S.C. § 1983 (The Civil Rights Act of 1871) on the theory that the statute in question effects a taking of property without just compensation and deprives the plaintiff's members of their property without due process of law.

This matter was originally considered by another judge of this Court who abstained and granted the defendant's motion to dismiss on the ground that regulation of insurance is an important state interest which involves a "complex mixture of state law and fact" that is best left to determination by the state courts. *Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer*, No. 86–0394, slip op. at 9 (D.R.I. March 23, 1987). However, the Court of Appeals concluded that abstention was not appropriate where the constitutionality of an unambiguous state statute is directly challenged, and there is no potential for disruption of pending state court proceedings or appellate processes. *Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer*, 832 F.2d 240, 244 (1st Cir.1987). Accordingly, the decision to abstain and dismiss the complaint was reversed, and the case was remanded and eventually assigned to this Court. After a bench trial consisting essentially of presentation of an undisputed record and the arguments of counsel, it is now ready for decision.

## BACKGROUND

### I. *Statutory Framework*

In the mid 1970's, Rhode Island, like many other states, was experiencing a serious problem stemming from the limited availability and rapidly escalating cost of medical malpractice insurance. Insurance companies became concerned about what they perceived to be legal and market trends that made such coverage far riskier and much less profitable. Consequently, many companies stopped issuing such policies, and those that continued to do so dramatically increased their premiums. Soaring premiums substantially raised the cost of medical care and caused many physicians to consider withholding all but emergency services until corrective action was taken.

The Rhode Island General Assembly responded by enacting R.I.Gen.Laws § 42–14.1–1 which authorized creation of a joint underwriting association (the "JUA") empowered to issue malpractice insurance policies to physicians, hospitals, and health care providers. All insurers writing personal injury liability insurance within the state were required to participate in the JUA in proportion to their respective shares of the liability insurance market.

The statute requires that policies issued by the JUA be "subject to a group retrospective rating plan" approved by the Director of Business Regulation and that they be "calculated to be self-supporting." R.I.Gen.Laws § 42–14.1–1(C). In an apparent effort to protect policyholders from sudden rate increases and to preserve the JUA's ability to satisfy claims, the statute also provides for creation of a stabilization reserve fund (the "SRF"). The SRF is generated from one-time assessments against each policyholder equal to one-third of the policyholder's initial annual premium. R.I.Gen.Laws § 42–14.1–1(D); R.I. Dept. of Business Regulation, Insurance Division, Regulation XXI, § VI(B) (1982) (hereinafter "Regulation XXI"). Originally, investment income from the JUA's underwriting fund (i.e. the fund from which claims and operating expenses are paid) was paid into the SRF. However, in 1982, the implementing regulations were amended not only to eliminate that practice; but, also, to require that investment income from the SRF be deposited in the underwriting fund. Regulation XXI, § VI(E). Consequently, at the present time, the SRF's only source of income is the one-time assessment of new policyholders.

The stated purpose of the SRF is to "discharge when due ... any retrospective premium charges payable by policyholders of the association under the group retrospective rating plan authorized by regula-

tion." R.I.Gen.Laws § 42–14.1–1(D). If the fund is insufficient to pay such charges, JUA members are required to contribute whatever amount may be necessary to make up the deficit. Regulation XXI, §§ V(F), VIII.

Most of the policies issued by the JUA are of the claims-occurrence variety. That is to say, each provides coverage for incidents occurring while the policy is in force (i.e. during the policy year) irrespective of when claims arising from those incidents may be made. Since the statute of limitations for minors asserting such claims may be as long as 21 years, the JUA's exposure has what is referred to as a "long tail." For that reason, no policy years have yet been closed and, therefore, no retrospective rating plan has been devised. However, the parties agree that if and when the underwriting fund is unable to meet its obligations as they mature, the SRF will be used to pay any operating deficit. Moreover, if and when that fund is exhausted, the JUA's members will be forced to advance whatever additional funds may be required to keep the JUA afloat.

It is undisputed that reimbursement for any such advances may be sought in accordance with the "recoupment" procedure prescribed in R.I.Gen.Laws § 42–14.1–1(E). That section authorizes the Director to permit participating insurers to make a surcharge with respect to future policies of up to 1% of the annual premiums charged or, alternatively, to deduct their respective shares of the deficit from past or future taxes due the State of Rhode Island.

## II. *The Rate–Setting Procedure*

The statutes and regulations dealing with the manner in which the JUA's rates are established reflect the mandate of § 42-14.1-1 that it be self-supporting. Thus, the implementing regulations require that:

All rates shall be on an actuarially sound basis, giving due consideration to the group retrospective rating plan and the stabilization reserve fund, and shall be calculated to be self-supporting. Regulation XXI, § V(C).

The regulations also make it clear that rates are to be fixed in accordance with the procedures applicable to most other forms of liability and casualty insurance as set forth in Title 27, Chapter 9 of the Rhode Island General Laws. Regulation XXI, § V(C). The stated purpose of that chapter is to establish rates that "shall not be excessive, inadequate, or unfairly discriminatory." R.I.Gen.Laws § 27–9–1. Therefore, it requires that "[d]ue consideration" be given, among other things, to past and prospective loss experience and expenses, perceived hazards, and "a reasonable margin for underwriting profit and contingencies." R.I.Gen.Laws § 27–9–4(a)(1).

Under R.I.Gen.Laws § 27–9–1 *et seq.,* rates proposed by insurers must be filed with the Insurance Commissioner but do not take effect until expiration of a thirty day waiting period. R.I.Gen.Laws §§ 27–9–7, 27–9–10. During the waiting period, the Commissioner may disapprove the rate if it fails to meet applicable requirements or may schedule a hearing on the filing to determine whether the requested rate should be allowed in whole or in part. R.I. Gen.Laws § 27–9–16. If no action is taken during the waiting period, the rate becomes effective. R.I.Gen.Laws § 27–9–10. If a hearing is scheduled during the waiting period, the proposed rate cannot take effect until the hearing is completed, and a decision is issued. *Id.* Any action taken by the Commissioner may be appealed to the Rhode Island Superior Court. R.I.Gen. Laws § 27–9–49.

In determining whether a proposed rate should be allowed, the Commissioner may take the experience of past years into account. However, the rate upon which premium charges are based is prospective only. In other words, it is computed on the basis of actuarial projections regarding the amount necessary to pay claims and expenses referable to policies that will be issued during the period covered by the proposed rate and does not include any allowance for recoupment of losses attrib-

utable to policies issued during *previous* years. Moreover, as already noted, if the SRF is insufficient to cover claims and expenses, any remaining deficit must be paid by participating insurers subject to the method of recoupment authorized by R.I. Gen.Laws § 42–14.1–1(E).

## III. *The 1986 Rate Freeze*

On March 7, 1986 the JUA filed a proposed rate for the 1986–1987 policy year seeking a substantial premium increase to avert what it projected would otherwise be a $13.5 million deficit. Part of that deficit consisted of claims expected to be made in the future pursuant to policies issued during the policy year. The Commissioner scheduled a rate hearing for June. Before the hearing was held, the Rhode Island General Assembly enacted R.I.Gen.Laws § 42–14–2.4 which froze medical malpractice insurance premiums for the period from July 1, 1986 to June 30, 1987 at the level established for the preceding year. That statute provides:

> 42–14–2.4. *Moratorium on premiums for medical malpractice insurance.—* There shall be no increase for the period from July 1, 1986 to June 30, 1987 in any basic rate insurance premium assessed to any physician.... Nothing herein shall be construed to prevent the imposition of any special assessment and/or surcharge as set forth in § 42–14.1–1(D) and/or (E).

R.I.Gen.Laws § 42–14–2.4.

Because of that legislation, the Commissioner cancelled the scheduled hearing, and consequently, the rate remained the same as that established for the preceding year.

## IV. *The Contentions of the Parties*

The JUA instituted this suit claiming that the "freeze" is tantamount to a taking of its property without just compensation and a deprivation of property without due process of law. Specifically, it cites the uncontradicted testimony of its actuary that the "frozen" rate will result in a loss of $13.5 million for the 1986–1987 policy year. It points out that such loss, when added to its cumulative projected deficit of approximately $140 million, dwarfs the $2 million SRF. It argues that the inevitable result is that, in order to make up the deficiency, JUA members will be required to advance substantial sums of their own money for an indeterminate period and without receiving any interest.

The Director resists the JUA's claim on several grounds. First, he asserts that the JUA lacks standing to sue the state because the statute creating the JUA makes it an "integral part of the state government." R.I.Gen.Laws § 42–14.1–1(H). With respect to the takings claim, the Director argues that, since the participating insurers will not be required to advance funds until the projected losses actually occur (i.e. when anticipated future claims must be paid), the necessity of making such advances is too speculative to amount to a constitutionally protected property right. In addition, he asserts that even if the prospect of future advances is considered a property right, the provisions for recoupment afford just compensation. Finally, the Director asserts that there is no deprivation of due process because there is a rational basis for the freeze which represents a reasonable exercise of the state's police power.

## DISCUSSION

### I. *Standing*

The threshold question is whether the JUA has standing to maintain this action. As previously noted, the Director contends that the JUA lacks standing because the statute authorizing its creation provides that:

> Any joint underwriting association created pursuant to the authority granted in this chapter ... shall be an integral part of the state government, and its activities shall constitute the performance of an essential governmental function of the state of Rhode Island.

R.I.Gen.Laws § 42–14.1–1(H). Consequently, the Director contends that allowing the JUA to institute litigation against a state agency is tantamount to permitting it to sue itself.

674

The short answer to that contention was supplied by the First Circuit in *Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer*, 832 F.2d 240 (1st Cir.1987). There, the Court specifically rejected that argument saying:

> Appellee [Director Pfeiffer] also asserts, without argument, that the JUA is an integral component of state government and therefore lacks standing to sue itself. However, a state cannot conscript an entire profession into an involuntary association and thus make it an "integral component of state government" without standing to protect its interests from that of government.

*Id.* at 244 n. 7.

▪ The Director also points to the fact that, unlike legislation creating other associations and quasi public agencies, the JUA's enabling legislation does not expressly confer the capacity to sue. The Director cites that omission as evidence of a legislative intent to deprive the JUA of such capacity. However, even if such an intent were to be inferred, it would not deprive the JUA of standing to maintain this action. An association has standing to bring suit when its individual members would have standing and when the interests sought to be protected are germane to the association's purpose and the requested relief does not require participation of the individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). As noted in *Medical Malpractice v. Pfeiffer, supra*, it makes no difference whether the association is voluntary or involuntary because the state cannot require members to belong and then deny them the right to collectively protect their interests. 832 F.2d at 244 n. 7. Therefore, this Court rejects the Director's arguments and holds that the JUA does have standing to bring this suit.

## II. *Ripeness*

▪ The next arrow in the Director's quiver is that the plaintiff's claim is not ripe for adjudication because the alleged harm has not yet occurred. The doctrine of ripeness is rooted in Article III, § 2, cl. 1 of the United States Constitution which limits the jurisdiction of federal courts to actual cases and controversies. In order to satisfy that requirement, a plaintiff "must allege some threatened or actual injury...." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Such injury must be " 'sufficiently real and immediate,' " *Blum v. Yaretsky*, 457 U.S. 991, 1000, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)), and not merely "conjectural" or "hypothetical." *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675.

▪ There is no litmus test for distinguishing between a threat of injury that is "real and immediate" and one that is only "conjectural or hypothetical." Consequently, that determination must be made on a case-by-case basis. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). However, it is clear that the immediacy element does not require a plaintiff " 'to await the consummation of threatened injury [before] obtain[ing] preventive relief.' " *Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 596 (2d Cir.1988) (quoting *Blum*, 457 U.S. at 1000, 102 S.Ct. at 2783).

In this case, the Director points out that the participating insurers have not yet been forced to advance funds to cover the JUA's deficit because the JUA is still liquid enough to meet its current obligations and the SRF has not yet been exhausted. Consequently, he argues that, until such advances are actually made, the threatened injury is too remote and speculative to satisfy the ripeness requirement.

A similar argument was rejected by the Second Circuit in *American Insurers, supra*. That case involved a JUA scheme much like Rhode Island's in which the participating insurers were required to make involuntary contributions to cover any operating deficit. The Court held that, given the financial condition of the JUA, the imposition of a cap on premiums created a sufficiently "realistic" likelihood that the participating insurers would be required to

make involuntary contributions in the "immediate" future so as to satisfy the ripeness requirement. In so holding, the Court said:

> In light of the severe deficits MLMIC [the Medical Liability Mutual Insurance Company] and MMIA [the New York Medical Malpractice Insurance Association] face, the implementation of §§ 8 and 40, which stabilize rates and prohibit liquidation of insolvent medical malpractice insurers, presents a realistic threat of injury to plaintiffs by inexorably forcing insurance company contribution in the future and the passing on of such costs to individual policy holders.

*Id.* at 598.

In this case, the uncontradicted evidence establishes a sizeable deficit in the underwriting fund. As of July, 1986, that deficit amounted to a figure in the vicinity of either $80 million or $140 million depending upon whether or not the fund's projected investment income is taken into account. Either figure far exceeds the $2.1 million then in the SRF. Furthermore, indications are that the magnitude of the disparity has increased during the pendency of this suit due, in part, to the $13.5 million deficit attributed to policies covered by the 1986 rate freeze.

In short, it appears inevitable that the underwriting fund will become insolvent in the near future unless something is done and that the SRF will be grossly inadequate to enable the JUA to meet its obligations as they become due. That, in turn, will require the JUA members to advance substantial sums of money to make up the deficiency. Consequently, the JUA alleges a threatened injury that is sufficiently real and immediate to make its claim ripe for consideration.

### III. The "Takings" and "Due Process" Claims

The JUA challenges the "freeze" on the grounds that it deprives its members of their property without substantive due process and amounts to a taking of that property without just compensation. Specifically, the JUA points out that the "freeze"

denies its members the opportunity to have the Director establish a rate that is reasonably necessary to recover their projected costs and expenses. Moreover, it maintains that the statutory scheme for reimbursing JUA members for funds they are required to advance to cover the resulting deficit falls far short of providing them with just compensation.

Generally speaking, regulation having an adverse economic impact is subject to attack on substantive due process grounds if it is " 'arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.' " *Pennell v. San Jose,* 485 U.S. 1, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988) (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 769–70, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968)). Since economic regulation does not implicate "fundamental rights," substantive due process is satisfied if the regulation is rationally related to a legitimate state interest. *Nebbia v. New York,* 291 U.S. 502, 537–39, 54 S.Ct. 505, 516–17, 78 L.Ed. 940 (1934). However, in rate-regulation cases, courts now eschew a substantive due process analysis. Instead, they determine the validity of such regulations in accordance with the "takings clause" of the Fifth Amendment. *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013 (1st Cir.1989).

The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." That prohibition is applicable to the states through operation of the Fourteenth Amendment's due process clause. *E.g., id.* at 1023; *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 175 n. 1, 105 S.Ct. 3108, 3111 n. 1, 87 L.Ed.2d 126 (1985). In order to establish a Fifth Amendment violation, one must demonstrate both that "property" was "taken" and that no provision was made awarding "just compensation." In this case, the Director contends that the JUA has failed on both counts.

### A. The "Taking" Requirement

In the context of rate cases, it is well settled that a rate that is so "unjust"

as to be confiscatory constitutes a taking within the meaning of the Fifth Amendment. *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 615, 102 L.Ed.2d 646 (1989). The First Circuit has stated that:

> regulated rates must be "just and reasonable" in order to be constitutional. To be just and reasonable, rates must provide not only for a company's costs, but also for a fair return on investment. Rates which fall below this standard are "confiscatory."

*Tenoco Oil,* 876 F.2d at 1020 (citations omitted).

In this case, whether a higher rate is warranted is not a matter for this Court to decide. Rather, it is a determination to be made by the Director pursuant to the procedures set forth by state law and in accordance with applicable constitutional requirements. However, in light of the uncontradicted evidence that the rate freeze will cause the JUA to incur a $13.5 million deficit for policies issued during the 1986–1987 policy year, it is a determination that must be made. The state legislature cannot foreclose the Director from establishing a "fair and just" rate by freezing that rate at an arbitrary level.

The Director suggests that, even if the "frozen rate" results in a deficit, there has been no "taking" because the JUA's members have not yet been required to advance any funds to cover that deficit. It may be that, right now, the deficit exists only on paper because many of the projected claims upon which it is based have not yet materialized. However, that does not make them any less real. The Director does not question the manner in which the deficit was calculated or the likelihood that, at some point, those obligations will have to be paid. Those computations are based on undisputed actuarial evidence. Instead, the Director makes an ostrich-like argument that if the deficit is ignored, it ceases to exist. That argument simply does not pass muster. The accrued deficit of somewhere between $80–$140 million is unlikely to disappear, especially if annual deficits continue to be incurred. Consequently, the Court finds that the JUA has presented at least *prima facie* evidence of a taking sufficient to implicate the JUA's Fifth Amendment interests.

## B. *Just Compensation*

■ The Director asserts that, even if the rate freeze constitutes a taking of the JUA's property, there can be no Fifth Amendment violation because the statutory reimbursement provisions provide just compensation. Specifically, he cites R.I.Gen. Laws § 42–14.1–1(E) which requires that, upon certification by the JUA that an operating deficit remains after the SRF has been exhausted, the Director is required to authorize the association's members "to commence recoupment" by one of the following methods:

> (1) Applying a surcharge to be determined by the association at a rate not to exceed one percent (1%) of the annual premiums on future policies affording those kinds of insurance which form the basis for their participation in the association, under procedures established by the association; or
> (2) Deducting their share of the deficit from past or future taxes due the state of Rhode Island.

R.I.Gen.Laws § 42–14.1–1(E).

As the JUA points out, the recoupment provisions fall short of providing "just compensation" for two reasons. First, although the regulations require the Director to authorize the "commencement" of recoupment procedures within 60 days after certification of a deficit, no limit is established for how long the process may take. Second, no provision is made for the payment of interest on the amounts that participating carriers are required to advance.

Neither of the recoupment methods is likely to provide reimbursement for a number of years. If present trends continue and no action is taken until the JUA becomes insolvent, the deficit will probably far exceed the $80–$140 million that existed when this action was commenced. The parties agree that, if the JUA members were permitted to impose a 1% surcharge on all of the types of liability insurance they

write, it would take at least three to four years to recoup $100 million. Obviously, that period would be greater if the deficit is larger.

The prospects for reimbursement via tax rebates is even more uncertain. There is virtually no evidence indicating the magnitude of the participating companies' tax liabilities nor is there any explanation as to what authority the Director would have to unilaterally rebate taxes previously paid or to forgive taxes currently owed to the State of Rhode Island. Consequently, the parties concede that, like the first method of reimbursement, this one is conjectural.

The uncertainties inherent in these two methods of reimbursement are compounded by the fact that the method employed is to be selected by the Director. Regulation XXI, § V(F); R.I.Gen.Laws § 42–14.1–1(E). Thus, the JUA has no assurance as to which method is selected. The lack of such an assurance and the uncertainties regarding the sufficiency of each method violate the principle that "just compensation" requires a method of reimbursement that is reasonable, certain and adequate. *Williamson*, 473 U.S. at 194, 105 S.Ct. at 3120 (quoting *Regional Rail Reorganization Cases*, 419 U.S. 102, 124–25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974)).

The inadequacy of the recoupment process is further underscored by its failure to provide for interest on the amounts the JUA's members are forced to advance. As previously stated, those amounts are likely to be substantial and the time during which participating companies will be deprived of the investment earnings they would otherwise generate promises to be lengthy. The fact that the Director *might* induce the state to pay interest is far too speculative to satisfy the requirements of just compensation.

## IV. *Relief*

■ Having concluded that the "rate freeze" contained in R.I.Gen.Laws § 42–14–2.4 fails to pass muster under the takings clause of the Fifth Amendment, the Court must now address the relief requested by the JUA.

### A. *Declaratory and Injunctive Relief*

From what has already been said, it is apparent that the JUA is entitled to a judgment declaring R.I.Gen.Laws § 42–14–2.4 to be unconstitutional. It is equally apparent that the Director should be enjoined from relying on that statute in considering the JUA's rate request for the policy year 1986–1987.

However, the Court sees no basis for issuing a mandatory injunction requiring the Director to conduct a hearing on that proposed rate. As previously noted under Rhode Island law, there are several courses open to the Director in dealing with a proposed rate. He may take no action, in which case the rate becomes effective after expiration of the 30 day waiting period. Alternatively, he may summarily disapprove the rate for failure to comply with statutory requirements. Still another option would be for him to schedule a hearing on the rate request and make a decision based upon the evidence adduced at that hearing. It is not up to this Court to mandate which of those courses should be followed. That is a matter residing within the discretion of the Director whose decision may be appealed to the state courts in accordance with the review procedures prescribed by state law. Consequently, while hearings may be an appropriate way in which to deal with the plaintiff's request, this Court declines to issue a mandatory injunction requiring that such hearings be conducted.

### B. *Attorneys' Fees*

■ The JUA has requested an award of attorneys' fees under 42 U.S.C. § 1988 or 28 U.S.C. § 2202. Since it is clear that the JUA is entitled to such an award under § 1988, the Court need not consider the applicability of § 2202. Title 42 U.S.C. § 1988 provides:

> [i]n any action or proceeding to enforce a provision of section[ ] ... 1979 ... of the Revised Statutes [42 U.S.C. § 1983] ... the court, in its discretion, may allow the prevailing party, other than the United

States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988.

A litigant is considered a "prevailing party" for purposes of the statute if it " 'succeed[s] on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit.' " *Exeter–West Greenwich Regional School District v. Pontarelli*, 788 F.2d 47, 50 (1st Cir.1986) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). In this case, there is no question that the JUA is the prevailing party.

Nor is there any question that attorneys' fees may be awarded to a plaintiff in a § 1983 action seeking injunctive or declaratory relief from a state or state officials acting in their official capacities. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Such awards are not barred by the Eleventh Amendment because "Congress has plenary power to set aside the States' immunity from retroactive relief in order to enforce the Fourteenth Amendment." *Id.* at 693, 98 S.Ct. at 2575. Congress has exercised that power by enacting § 1988 which makes attorneys' fees part of the costs which may be recovered by a prevailing plaintiff. *Id.* at 695, 98 S.Ct. at 2575. Although *Will v. Michigan Dept. of State Police* precludes § 1983 suits against states or state officials acting in their official capacities for *money* damages or other forms of *retrospective* relief, it does not prohibit suits for injunctive or declaratory relief. 491 U.S. 58, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989). Therefore, states are still subject to liability for attorneys' fees incurred by a plaintiff who succeeds on such claims. *Hutto*, 437 U.S. at 699–700, 98 S.Ct. at 2578.

## CONCLUSION

Stabilization of malpractice insurance premiums is a laudable goal. However, it cannot be accomplished by freezing rates at an arbitrary level and foreclosing any opportunity to have a determination made as to whether that rate is fair and reasonable. "Freezing" the JUA's rates at an arbitrary level that the evidence indicates is so unreasonable as to be confiscatory constitutes an unlawful taking within the meaning of the Fifth Amendment. *Duquesne Light Co.*, 109 S.Ct. at 615. In addition, the "recoupment" methods provided by R.I.Gen.Laws § 42–14.1–1(E) do not constitute just compensation because, if events continue on their present course, the JUA is likely to become insolvent and its members will be forced to advance substantial amounts of their own money for a protracted period of time without receiving interest. Consequently, those methods do not provide a method of compensation that is reasonable, certain or adequate. *Williamson*, 473 U.S. at 194, 105 S.Ct. at 3120 (quoting *Regional Rail Reorganization Cases*, 419 U.S. 102, 124–25, 95 S.Ct. at 349 (1974)). Accordingly, the Clerk is directed to enter judgment in favor of the plaintiff declaring R.I.Gen.Laws § 42–14–2.4 to be unconstitutional and enjoining the defendant from relying on that statute in considering the JUA's rate request for the policy year 1986–1987.

In addition, the plaintiff is directed to file a motion for an award of attorneys' fees under Title 42 U.S.C. § 1988 together with supporting memoranda, affidavits and time records within thirty (30) days. Failure to do so shall be deemed a waiver of any such claim. Within ten (10) days after service of any such motion, the defendant may request an evidentiary hearing for the purpose of disputing any of the factual matters presented or contesting the rate of compensation requested. Failure to file such an objection within the prescribed time shall be deemed a waiver of any right to an evidentiary hearing.

IT IS SO ORDERED.