**UNITED STATES FIDELITY AND GUARANTY COMPANY, et al.,**

v.

**W. Fox MCKEITHEN, et al.**

No. Civ. A. 96–385–A.

United States District Court, M.D. Louisiana.

March 5, 1999.

---

**158.** *Wheat,* 486 U.S. at 164, 108 S.Ct at 1699.

Donald T.W. Phelps, Adams & Reese, Baton Rouge, LA, Mark F. Horning, Eric C. Grimm, Steptoe & Johnson, Washington, DC, for plaintiffs.

Erich P. Rapp, Robert Mark Hoyland, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, James Carl Hrdlicka, Louisiana Department of Justice, Litigation Division, Baton Rouge, LA, for defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

JOHN V. PARKER, District Judge.

This matter is before the court on motions for summary judgment submitted by both the plaintiffs [1] and defendants [2] and a motion to dismiss by the defendants which

---

1. Plaintiffs in this case consist of the following private insurance companies: United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc. Argonaut Insurance Company, Argonaut Midwest Insurance Company, Argonaut Southwest Insurance Company, Commercial Union Insurance Company, American Central Insurance Company, American Employers' Insurance Company, Employers' Fire Insurance Company, Northern Assurance Company of America, United States Fire Insurance Company, North River Insurance Company, Insurance Company of North America, Banker's Standard Insurance Company, Century Indemnity Company, Cigna Fire Underwriters Insurance Company, Cigna Indemnity Insurance Company, Cigna Insurance Company, Cigna Property and Casualty Insurance Company, Cigna Specialty Insurance Company, Indemnity Insurance Company of North America, Pacific Employers Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast, Hartford Underwriters Insurance Company, Twin City Fire Insurance Company, Travelers Insurance Company, Aetna · Casualty & Surety Company, Travelers Indemnity Company, Travelers Indemnity Company of America, Travelers Indemnity Company of Connecticut, Travelers Indemnity Company of Illinois, Charter Oak Fire Insurance Company, Phoenix Insurance Company, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation.

2. Defendants, as set forth in the amended complaint dated August 27, 1996 are: the members of the Louisiana worker's compensation board (which include the following: Louisiana Secretary of State W. Fox McKeithen, Louisiana State Treasurer Ken Duncan, Louisiana Director of Worker's Compensation Ron Menville, Louisiana Commissioner of Insurance James H. Brown, and Louisiana Secretary of Social Services Madlyn B. Bagneris), the Louisiana Secretary of Labor Robin M. Houston, and the Louisiana Commissioner of Insurance James H. Brown.

was converted into a motion for summary judgment by the court. There is no need for oral argument. Jurisdiction is based on federal question jurisdiction under 28 U.S.C. § 1331.

All motions were referred to Magistrate Judge Stephen C. Riedlinger for a report and recommendation under 28 U.S.C. § 636. The report and recommendation has been filed and both sides have filed objections thereto. Accordingly, the court reviews the entire matter *de nova.*

The facts are essentially undisputed and many of the "facts" are actually issues of law. The matter has been extensively briefed and the court has carefully reviewed all information submitted by all parties.

The court concludes that the magistrate judge's recommendation to grant defendants' motion for summary judgment on the Contract Clause claim and the Equal Protection claim is correct, and those conclusions of the magistrate judge's report are hereby adopted, although the court does not necessarily adopt all of his reasoning. The court also concludes, for reasons stated below, that the magistrate judge's recommendation to grant summary judgment in favor of plaintiffs on the Takings Clause claim is not correct and it is rejected.

## BACKGROUND

All plaintiffs are insurance companies which now or formerly issued workers compensation policies to Louisiana employers. All have significantly reduced the number of policies sold in Louisiana in recent years and at least two of them have ceased issuing such policies at all.

In 1974 Louisiana, following the lead of many other states, established a second injury fund. According to L.R.S. 23:1371 A, its purpose is:

... [T]o encourage the employment of physically handicapped employees who have a permanent, partial disability by protecting employers, group self-insur-

ance funds, and property and casualty insurers from excess liability for workers' compensation for disability when a subsequent injury to such an employee merges with his preexisting permanent physical disability to cause a greater disability than would have resulted from the subsequent injury alone.

The Fund is used to pay administrative expenses and to reimburse compensable second injury benefits paid by self-insured employers and insurers. Since no public monies were supplied, Louisiana requires that every insurer and self-insured employer pay annual assessments. LRS 23:1377 B. The Fund has from its beginning operated on a year-to-year basis; that is, all assessments collected in a calendar year are paid out in that year (at least in theory) and the Fund is replenished by the next year's assessments.

Initially, assessments upon insurers was calculated as a percentage of the gross premium volume for workers compensation policies sold in Louisiana the preceding year. Self-insured employers were assessed upon an estimate of the premium they would have paid had they been insured.

As the years passed and the numbers of workers compensation insurance policies issued in Louisiana decreased, so did premium volumes. The state increased the percentage of the assessment several times in order to obtain sufficient funds to pay claims.

In 1995, the Louisiana Legislature adopted Act 188 of 1995 which amended LRS 23:1377 B so as to require that annual assessments to the Fund be calculated as a percentage of the workers compensation benefits paid by insurers and self-insured employers. The Fund continues to reimburse insurers and employers in full for all compensable second injury benefits paid.

Under the old assessment procedure, plaintiff companies that had sharply reduced premium volumes also were paying

sharply reduced assessments. Of course, in the case of companies that had stopped issuing new policies, there was no premium volume and hence no assessment. All plaintiff companies continued to pay claims on previously issued policies and all continued to claim and receive reimbursement from the Fund for all benefits paid each year.

Plaintiffs claim, and were able to convince the magistrate judge, that this change in the method of calculating annual assessments for the Fund constitutes a taking of their property without compensation in violation of the Fifth Amendment to the Constitution. They concede that a number of other states calculate such assessments upon benefits paid and that no constitutional or other challenge has been made in those states.

Plaintiffs have summarized their argument at pages 2 and 3 of their objection to the magistrate judge's report:

"In 1974, Louisiana established a Workers' Compensation Second Injury Fund to compensate previously-disabled workers for lost wages and medical care arising from a second occupationally-related injury. The Fund principally was financed by annual assessments on workers' compensation insurers, including plaintiffs, calculated as a percentage of the premiums collected under each insurer's contracts of insurance. However, ... these assessments imposed no net cost on insurers because they were allowed to pass the assessments through to employers by means of increased rates.... The employers of the injured workers thus ultimately bore the cost of the system.

In the late 1980s and early 1990s, plaintiffs experienced severe losses in the Louisiana workers' compensation insurance market and either withdrew from the market or substantially reduced their underwriting in the state.... In response, Louisiana radically revised its assessment statute in an effort to shift the financial burden of the Second Inju-

ry Fund from employers to withdrawing insurers that no longer were collecting significant premiums in Louisiana. In 1995, the basis for assessments was changed from a percentage of premiums to a percentage of benefits paid out by the insurer to injured employees... By basing assessments on benefits rather than premiums, insurers could be assessed even though they no longer wrote a significant volume of business in Louisiana. Indeed, the 1995 change in the law expressly was made applicable to insurers that had ceased doing business in Louisiana ... In substantial part, this change was retroactive because the assessments largely were based on benefits paid out under contracts entered into years and even decades before 1995.

The 1995 legislation fundamentally transformed the assessment system in two respects. First, a double assessment effectively was imposed on pre-1995 insurance contracts. Even though insurers previously had paid an assessment out of the premium dollars collected under the past contract, they were now compelled to pay a second assessment out of the same premium dollars needed to pay benefits to injured employees under that contract. Second, unlike the regime established under the 1974 statute, insurers no longer were allowed to recoup the second, retroactive assessment. This was because they no longer did business in Louisiana sufficient to permit them to recover the assessments by means of rate increases." (Citations omitted)

## DISCUSSION

This court concludes that, contrary to the position advocated by plaintiffs, there is no taking here in the constitutional sense. Plaintiffs are simply seeking a "free ride" to reimbursement for second injury benefits paid by them under previously issued insurance policies (for each of which the insured paid a premium) using money paid into the Fund by others.

Plaintiffs are not "paying twice" and they are not being assessed "retroactively"; nor are they "deprived of the right" to recover assessments by passing that cost on to their insureds through increased insurance premiums because of Louisiana's change in assessment procedure.

 In the context of a taking claim, regulatory taking occurs when the value or usefulness of private property is diminished by regulatory action that does not involve physical occupation of property.[3] The purpose of the Takings Clause is " 'to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "[4] In order to establish a violation, "one must demonstrate both that 'property' was 'taken' and that no provision was made for awarding 'just compensation.' "[5]

If every statutory change were a taking, it would cripple the ability of federal and state legislatures to adjust the benefits and burdens of economic life. In the words of Professor Fuller, cited approvingly by the Supreme Court, 'If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.'[6]

The Supreme Court has regarded the Takings Clause as substantially similar to the doctrine of substantive due process and has given broad scope to legislative prerogatives to modify legal rules without having to compensate affected parties for the costs resulting from the changes. In cases analogous to this one, the Court has made that point explicitly, observing that it would be "surprising indeed to discover" that a statute that satisfied the Due Process Clause nonetheless violated the Takings Clause. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986); *Concrete Pipe & Prods. v. Const. Laborers Pen.*, 508 U.S. 602, 641, 113 S.Ct. 2264, 2289, 124 L.Ed.2d 539 (1993)

In the *Connolly* and *Concrete Pipe*, cases, the Supreme Court upheld, against both Due Process and Takings Clause claims, statutory changes in pension law that resulted in the imposition of liability on companies that withdrew from multiemployer pension plans. The Court in Connolly began its takings analysis by noting that a statute establishing a new form of liability is a kind of regulatory statute that does not necessarily effect a taking:

In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist.... [L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.[7]

Although scholars expected that the Court's decision in *Eastern Enterprises v. Apfel*,[8] would provide insight to these relatively vague factors, it did not.[9] In that

**3.** U.S.C.A. Const.Amend. 5.

**4.** *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

**5.** *Medical Malpractice Joint Underwriting Ass'n v. Paradis*, 756 F.Supp. 669, 675 (D.R.I. 1991).

**6.** Lon Fuller, The Morality of Law 60 (1964), quoted in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 n. 24, 114 S.Ct. 1483, 1499 n. 24, 128 L.Ed.2d 229 (1994).

**7.** 475 U.S. at 223, 106 S.Ct. at 1025 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976)).

**8.** 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451(1998), 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

**9.** The Supreme Court 1997 Term, Leading Cases, I. Constitutional Law, E. Takings Clause, 112 Harv.L.Rev. 212 (1998).

case, Eastern Enterprises ("Eastern"), a company which participated in coal mining from 1946 to 1965, was also involved in a series of labor negotiations over the provision of health and pension benefits with its employees. A nationwide strike and a 1946 Executive Order by President Truman to nationalize coal mining forced Coal Mining employers to sign the National Bituminous Coal Wage Agreement of 1947, an agreement providing health benefits to miners. In 1950 the agreement was modified to include lifetime guarantees for retirees, subject to possible alterations. The 1950 agreement remained the same until 1974, when a new collective bargaining agreement established mandatory lifetime benefits. After the 1974 agreement, years of financial crises ensued, prompting the Congress to enact the Coal Industry Retiree Health Benefit Act of 1992, an effort to stabilize fund financing to safeguard retired miners' benefits. The Coal Act directed the Commissioner of Social Security to assign responsibility for each retiree to a mining company, based on the length of time the miner worked for each employer and each employer's prior participation. Eastern, however, had ceased its mining operations by the end of 1965, and its agreement with its employees prior to this time never contained lifetime benefit's provisions. Nevertheless, the Commissioner assigned it responsibility for more than 1,000 retirees at an annual cost of five million dollars. Eastern contested the assignment, claiming that it violated the Takings and Due Process Clauses.

In a plurality opinion by Justice O'Connor, the Court held that the Coal Act as applied to *Eastern* effected an unconstitutional taking. Recognizing that there is no "set formula" for identifying an unconstitutional taking forbidden by the Fifth Amendment, the court, relying on prior decisions, suggested "ad hoc, factual inquiries into the circumstances of each partic-

ular case." As in *Connolly,* the Court stated that there are three factors of "particular significance" to a regulatory taking's clause analysis: (1) the character of the government action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with reasonable investment-backed expectations.[10]

 While the factors used in *Eastern Enterprises* are proper in our Takings Clause analysis, the plaintiffs argue that our facts are also analogous. The court disagrees. The above factors as they applied to the plaintiff in *Eastern* represented a taking since it subjected it to an unexpected and actually retroactive liability for a problem which was not caused by any of the plaintiff's actions and which the plaintiff could not have predicted. As shown below, the plaintiffs in this case entered a highly regulated market, were subjected to an assessment which adjusted the benefits and burden of economic life upon them as a result of entering the market. The parties were aware that the law had no guarantee of remaining constant.

### A. The Character of the Government Action

With regard to the first factor, Louisiana did not appropriate money for its own use. The assessment, whether premium-based or benefits-based, does not end up in the general coffers of the state. Quite the contrary, the purpose of the Second Injury Fund is to encourage employment of employees who have already sustained an injury. This is not a taking that deprives the plaintiffs of their property but rather is "a public program that adjusts the benefits and burdens of economic life to promote the common good." [11] The assessment in this case is a rational attempt by the state to impose the costs inherent in a

---

10. *Id.* at 225, 106 S.Ct. at 1026; *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984).

11. *Connolly v. Pension Benefit Guar. Corp,* 475 U.S. at 225, 106 S.Ct. at 1026.

certain type of business activity on "those who have profited from the fruits" of the business in question.[12] The need for such a fund and the subsequent change in the assessment procedure is not one which the entire state should bear. Rather, its need is directly related to the employers' refusal to hire already injured and partially disabled workers because of the fear that a second injury would increase workers compensation costs, whether by insurance premiums or payment of benefits.

A violation of the Takings Clause requires more than the government's use of a person's property. To succeed, a party must also show that the taking was without just compensation.[13] The adoption of Act 188 of 1995 has not changed the character of Louisiana's action. The only change is the procedure for assessment. The purpose of imposing the new basis for assessment was to enable the Second Injury Fund to remain adequately funded. Insurers are still allowed to recover the cost of the assessment through the rate-making process just as they were prior to the 1995 Act. The fact that some companies have withdrawn or significantly reduced their business in Louisiana does not alter the fact that "a reasonable, certain and adequate provision for obtaining compensation" was provided at the time of the alleged taking.[14]

## B. The Economic Impact of the Regulation on the Claimant

No doubt the impact of Act 188 of 1995 on the plaintiff companies could be heavy. However, the assessment in this case is proportionate with defendant's experience with the Fund. The insurers who have left or who have substantially reduced their underwriting in Louisiana are not required to pay more than their experience with the

Second Injury Fund justifies. The plaintiffs do not make any claim that they will pay a greater amount or an amount that is not proportionate to what others will pay with regard to the Second Injury Fund. There clearly was no contractual obligation between the state and the plaintiffs which required the assessment to remain premium based. Furthermore, workers compensation insurance in Louisiana is a heavily regulated field, and the assessment, both before and after the 1995 amendment, is "a necessary consequence of the [state's] regulatory scheme."[15] Changes in the way government chooses to operate in this field or more specifically, changes in the way government assesses companies that wish to participate in the workers compensation industry were never guaranteed by the state, although this may have been the hope of the plaintiff companies.

## C. Investment Backed–Expectation

In *Eastern*, the plurality found that the Coal Act "substantially" interfered with the investment-backed expectations of the plaintiff. The plurality supported this claim by recounting the law's centuries-old disdain for retroactivity and noting that the Coal Act attached liability to conduct in which Eastern had engaged thirty to fifty years ago, at which time there was no understanding that miners would receive lifetime benefits. In *Eastern*, the plurality was concerned that the problem for which a party is held liable must be one at least partly of its own creation.

■ Act 188, however, is not retroactive. Prior to the enactment of the 1995 amendment, the law required workers compensation insurers and self-insured employers to pay assessments on a premi-

---

12. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 18, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976).

13. U.S.C.A. Const.Amend. 5.

14. *Liberty Mutual Insurance Co. v. Whitehouse,* 868 F.Supp. 425 (D.R.I.1994), citing, *Metropolitan Transp. Auth. v. ICC,* 792 F.2d 287, 296–97 (2d Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986).

15. 475 U.S. at 226, 106 S.Ct. at 1027.

um-volume basis. The assessment was based on the premiums collected in the previous year. The Fund then reimbursed companies and employers who paid benefits to persons with second injuries. At the end of the year, the Fund should in essence be depleted, and then replenished by a new assessment. Plaintiffs, like all others who chose to participate in the worker's compensation industry, paid yearly.

Act 188 changed the assessment procedure only, it did not change the character or the purpose of the Fund. It did not reach back, as in *Eastern*, and single out a particular class of persons to bear substantial costs, based on past conduct not related to those costs. The problem created in this case is one that is a result of the plaintiffs' own creation. Because the plaintiffs substantially reduced or are no longer underwriting and collecting premiums, the fund was no longer being adequately funded. Nevertheless, plaintiffs continued to reap the benefits of the Fund by collecting reimbursements for benefits paid under insurance contracts that they had written in the past. Thus, Act 188 does not seek to hold the plaintiffs liable for their past actions, rather it seeks to hold them responsible for their present actions by making everyone that is now paying benefits also pay an assessment. The assessment is directly related to the reimbursement benefits they presently receive, and not related to past acts.

 Furthermore, the time for considering investment backed expectations is the time the property is acquired, not the time the challenged regulation is enacted.[16] A regulatory taking occurs when a change in the law results in the immediate impairment of property rights, leaving the property owner no other options to avoid the loss.[17] Plaintiffs claim that this act violated their investment backed expectations because they no longer have any way of

recouping or passing on the costs imposed since they have reduced or ceased underwriting in Louisiana. This argument is unpersuasive.

## CONCLUSION

It bears repeating that the Second Injury Fund is not insurance; it was never underwritten as such and assessments paid by plaintiffs were never intended to be considered in any sense a "premium" payment for insurance. The Fund was and is a new fund each year; that is, the total amount of benefits to be paid for the next year is estimated and the assessment necessary to pay those benefits in that year is made. Thus, each fund year stands on its own bottom.

The State of Louisiana has little or no interest in how the assessed insurance companies acquire the means with which to pay the assessment; the state's interest is in having a second injury fund in an amount sufficient to pay benefits for each individual year. Assessments predicated upon premiums earned in Louisiana was an easy and convenient basis for making assessments when the fund was established in 1974. The state has set out a number of reasons why other bases were not used at that time and this court can not say that those suggestions were unreasonable or inappropriate or irrational. Obviously, funding must come from somewhere if there is to be a fund at all.

As this court understands their argument, plaintiffs want this court to declare that they are entitled to seek reimbursement from the fund for each year that they pay benefits in Louisiana but without the necessity of making any contribution to the Fund. If assessments were continued on the basis of premium volume, plaintiffs would effectively pay benefits under previously underwritten policies using other

---

**16.** *Yancey v. United States*, 915 F.2d 1534, 1540 (Fed.Cir.1990).

**17.** See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).; and *Connolly*.

people's money; they would be reimbursed for all benefits paid but make no or very little contribution to the Fund.

In this court's view, the State of Louisiana has found a rational method of requiring those companies who benefit from the Second Injury Fund to also contribute to it. Under these circumstances, there is no taking of property from these plaintiffs by Louisiana in violation of the Constitution.

If the plaintiff companies were required to make contributions to the Fund from which they could not seek reimbursement, then their argument of an unconstitutional appropriation of their property would have more validity.

For the foregoing reasons, the motion for summary judgment filed on behalf of plaintiffs (doc. 33–1) is hereby DENIED; the motion for summary judgment filed on behalf of defendants (doc. 44–1) is hereby GRANTED and this action shall be dismissed.